1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WILLIAM POLLARD,                           No.  2:24-cv-1747 WBS AC (P)

12                  Petitioner,

13        v.                                     FINDINGS AND RECOMMENDATIONS

14   ROB ST. ANDRE, Warden,

15                  Respondent.

16

17        Petitioner is a California state prisoner proceeding through counsel with an application for

18   a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the petition filed

19   on June 20, 2024, ECF No. 1, which challenges petitioner's 2020 conviction for multiple counts

20   of assault with a deadly weapon and related offenses.  Respondent has answered, ECF No. 12,

21   and petitioner has filed a traverse, ECF No. 15.

22                                    BACKGROUND

23   I.      Proceedings in the Trial Court

24        A.  Preliminary Proceedings

25        Petitioner was charged in San Joaquin County with five counts of attempted murder and

26   related offenses arising from a drive-by shooting into a moving vehicle.  I CT 97-118 (ECF No.

27   11-1 at 116-137) (Information).

28   ////

                                         1

B. The Evidence Presented at Trial

    1. Prosecution Case

One morning, Harvey Stenson was driving his girlfriend, Rayleen Armendariz, to her daughter's school. Their three year old son was in the backseat, along with Armendariz's seven year old daughter and Stenson's two year old son. They drove past an intersection, where Stenson and Armendariz saw petitioner in his car waiting at a red light in the left turn lane. At the time, petitioner was dating Stenson's ex-girlfriend, who is the mother of one of Stenson's children.

Upon seeing petitioner, Stenson said to Armendariz, "Look at that bitch ass [n-word]." As Stenson continued driving, petitioner moved his car out of the turn lane and sped in their direction. Petitioner tried to drive up beside Stenson's car in the right lane, but Stenson pulled in front of him. Petitioner moved his car left and pulled alongside Stenson's car. Armendariz looked to the left and saw a "flash" as petitioner began shooting through the passenger side window of his car. She heard approximately five gunshots. Bullets struck Armendariz's chin and right middle finger. No one else in the vehicle was hit. No one in Stenson's vehicle possessed a gun at the time of the shooting. Police later found two other bullet holes in Stenson's car; one in the rear left passenger door and one in the left tail light.

Asad Shah witnessed the shooting as he drove behind both cars, and he called 911. Shah told the dispatcher that he "believe[d]" that both cars were struck by bullets because he saw glass on the ground. At trial, Shah testified that he did not see windows break or know where the glass came from. Shah did not see anyone holding a gun and could not tell which car the shots came from.

Stenson drove Armendariz to the hospital, where she was treated for serious injuries on her face and finger, which required several subsequent surgeries.

    2. Defense Case

At the close of the prosecution's case, the defense moved for a directed verdict as to all counts of attempted murder. The motion was granted as to Counts 5, 7 and 9, which related to the three children who were passengers in Stenson's vehicle.

1    The defense called no witnesses.

2    C.  Outcome

3    The jury found petitioner guilty of five counts of assault likely to cause great

4    bodily injury (Cal. Pen. Code, § 245(a)(4)) and of being a felon in possession of a

5    firearm (Cal. Pen. Code, § 29800(a)(1)).  With respect to petitioner's assault on Armendariz, the

6    jury found true that petitioner personally inflicted great bodily injury (Cal. Pen. Code,

7    § 12022.7(a)).  The jury further found that petitioner personally used a firearm in relation to all

8    the assault counts (Cal. Pen. Code, § 12022.5 (a)).  Petitioner was found not guilty of attempting

9    to murder Armendariz.  The jury deadlocked on the charge of attempted murder of Stenson, and

10   that count was dismissed.

11   Petitioner admitted he had a prior strike conviction (Cal. Pen. Code, §§ 667(d),

12   1170.12(b)), prior serious felony conviction (§ 667(a)(1)), and a prior prison term (§ 667.5(b)).

13   The trial court sentenced him to an aggregate term of 32 years eight months in prison.

14   II.    Post-Conviction Proceedings

15   Petitioner timely appealed, and on May 24, 2022, the California Court of Appeal affirmed

16   the judgment of conviction but remanded for resentencing in accordance with new legislation.

17   ECF No. 11-38.  The California Supreme Court denied review on August 17, 2022.  ECF No. 11-

18   41.

19   Petitioner filed no applications for state collateral relief.  He filed a § 2254 petition in this

20   court during the pendency of state appellate proceedings regarding resentencing on remand.  See

21   Pollard v. St. Andre ("Pollard I"), Case No. 2:23-cv-0113 TLN DC (P).  That case was dismissed

22   without prejudice in light of the ongoing state proceedings.  Pollard I, ECF Nos. 23, 25.  The

23   instant petition was initiated after the conclusion of sentencing review in the state courts.

24   STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

25   28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

26   1996 ("AEDPA"), provides in relevant part as follows:

27       (d) An application for a writ of habeas corpus on behalf of a person
         in custody pursuant to the judgment of a state court shall not be
28       granted with respect to any claim that was adjudicated on the merits

3

1      in State court proceedings unless the adjudication of the claim –

2      (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
3      determined by the Supreme Court of the United States; or

4      (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
5      State court proceeding.

6          The statute applies whenever the state court has denied a federal claim on its merits,

7 whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99

8 (2011). State court rejection of a federal claim will be presumed to have been on the merits

9 absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed,

10 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a

11 decision appearing to rest on federal grounds was decided on another basis)). "The presumption

12 may be overcome when there is reason to think some other explanation for the state court's

13 decision is more likely." Id. at 99-100.

14          The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

15 principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538

16 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established

17 Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in

18 issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64

19 (2013).

20          A state court decision is "contrary to" clearly established federal law if the decision

21 "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529

22 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state

23 court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

24 the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court

25 was incorrect in the view of the federal habeas court; the state court decision must be objectively

26 unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

27          Review under § 2254(d) is limited to the record that was before the state court. Cullen v.

28 Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court

1    reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other

2    words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.

3    Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is

4    confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d

5    724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims

6    summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a

7    state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

8    must determine what arguments or theories may have supported the state court's decision, and

9    subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 102.

10                                          DISCUSSION

11   I.       Claim One: Batson Error

12            A.  Petitioner's Allegations and Pertinent State Court Record

13       Petitioner alleges that prospective juror Ms. S. was dismissed by the prosecution based on

14   her race, in violation of petitioner's equal protection rights.

15                1.  Relevant Voir Dire

16       The trial record does not reflect the racial composition of the jury pool or the race of

17   individual prospective jurors other than Ms. S.  Petitioner alleges here and represented in state

18   court that Ms. S. was the sole African American prospective juror, with the exception of one other

19   individual who was excused for cause.  Respondent has not affirmatively disputed that fact.

20                    a.  Ms. S.[1]

21       Juror No. 7, Ms. S., was African American.  ART 414 (ECF No. 11-30 at 4).  During voir

22   dire, Ms. S. stated that she was a widow and was previously employed as an accountant at Levi

23   Strauss.  She was a mother, grandmother, and great-grandmother.  Approximately four years

24   earlier, Ms. S. had served on a criminal jury that reached a verdict.  When asked whether she was

25   a leader or a follower, Ms. S. said that she had "control issues" when she is "put in a corner or

26   something like that," but that she would not pressure other jurors to change their minds.  She said

27

28   [1]  Voir dire of Ms. S. is found at ART 322-354 (ECF No. 11-29 at 127-159).

1   she could work in a team environment.

2          Regarding the concept of circumstantial evidence, the prosecutor asked Ms. S. what she

3   would think if she went outside and the sidewalk and street were wet, there were puddles in the

4   street, and people had umbrellas up and raincoats on with raindrops on them.  Ms. S. responded,

5   "Just because [a raincoat] has water on it doesn't mean it rained."  The prosecutor then asked,

6   "[I]f there's snow on the ground and the night before you went up to that cabin there's no snow

7   on the ground, what does that tell you?"  Ms. S. answered, "It doesn't tell me anything."  The

8   prosecutor asked Ms. S. if she was driving down the street, and the car in front of her turned on its

9   brake lights and right turn blinker and moved into the righthand turn lane, what did Ms. S. think

10  the car would do.  Ms. S. responded, "Turn right."  The prosecutor explained that Ms. S. drew

11  that conclusion using circumstantial evidence and asked if she was "suspicious of circumstantial

12  evidence."  Ms. S. replied, "No, just the example that you've given.  But no."

13          The prosecutor asked if Ms. S. was saying that she was "okay with the right turn" but "not

14  okay with it raining outside."  Ms. S. said, "Right now I don't know what I'm saying because I'm

15  thinking in my head of the example of the car.  You know, I'm always looking because that

16  person might decide to go left, although he gets the signal that he's going right. [¶] . . . [¶] So

17  there's always a possibility of something else happening.  Does that make sense to you?"  The

18  prosecutor answered in the affirmative, and then turned to another example, asking, "[I]f this

19  [microphone] is in my hand and I drop it because I really want to and it breaks, and I pick it up

20  and I say, 'Oh, look,' and you see that it's broken, . . . what do you think about how it got

21  broken?"  Ms. S. said, "That you dropped it."  The prosecutor explained that Ms. S.'s conclusion

22  was based on direct evidence because she "saw that break."  However, the prosecutor continued,

23  if she had dropped it behind a partition such that Ms. S. did not see it drop, but only saw the

24  resulting break, Ms. S. would say, "'Oh, she just broke it.'"  Ms. S. responded, "Okay.

25  All right."  The prosecutor said, "I think you're still a little suspicious on that," but Ms. S.

26   said, "No, no, no," and that she was "okay" and agreed she could give circumstantial evidence

27  the same weight as direct evidence.

28  ////

6

The prosecutor then asked, "Can you use circumstantial evidence to figure out what's in someone's head, what their intent is?"  Ms. S. answered, "How would you know what someone is thinking?  I don't have those skills. [¶] . . . [¶]  I would have to see the whole picture and, you know, like, all the evidence and how it fits and everything.  [¶] . . . [¶] I just can't look at a person and think what they are thinking."  The prosecutor asked, "So you would look at maybe physical evidence to conclude?"  Ms. S. said, "I would look at all the evidence to conclude."

The prosecutor returned to the microphone asking, hypothetically, "[I]f I take this [microphone] and throw it on the ground, do you need me to say, 'I wanted to break that microphone thing' in order for you to believe that I wanted to break it?  Or if I was just walking around and I slammed this thing on the ground, would that tell you something?  Is there a difference to you?"  Ms. S. responded, "No."  The prosecutor said, "It feels like you're guessing what the right answer might be," to which Ms. S. said, "I don't know what you want me to say."  The prosecutor said, "I want you to tell me what you think.  That's what I want you to say."  Ms. S. said, "You really want me [to] tell you what . . . I think? [¶] . . . [¶]  I just feel I have to see everything.  I have to see the whole puzzle.  I can't judge on just one thing just because you dropped it and say, 'Oh, that person's thinking about this.'  Whatever.  I just need more."

b.  Juror No. 10[2]

Juror No. 10 was questioned about circumstantial evidence immediately after Ms. S.  Juror No. 10 was single, employed as a process engineer, had no children, and had never served as a juror.  Her stepfather was a retired officer from the Stockton Police Department.  Juror No. 10 described herself as "independent," and confirmed she would neither "push nor be pushed."

In response to the prosecutor's question about proof of intent, Juror No. 10 said, "I don't think you can judge what someone is thinking," and that to know what someone is thinking, "you have to look at everything that happened, what was leading up to it happening."  The prosecutor said, "But you still are using that information to make a conclusion about what's in someone's mind, what their intent is?"  Juror No. 10 responded, "I suppose.  Yes."  The prosecutor asked,

[2]  Voir dire of Juror No. 10 is at ART 317-318 (ECF No. 11-29 at 122-123), 331-341 (ECF No. 11-29 at 136-146) (passim), and 354-355 (ECF No. 11-29 at 159-160).

1    "And do you have a problem doing that?  Like, do you feel like you would not be able to use

2    evidence in front of you to determine what's in someone's mind?  Because, ultimately, like I

3    discussed with one of the other jurors, intent is always an issue in every criminal case, so you are

4    going to have to figure that out.  So the question becomes how are you going to do that."  Juror

5    No. 10 answered, "I think you have to examine everything that's in front of you in deciding what

6    happened."

7         The prosecutor did not exercise a peremptory challenge against Juror No. 10.

8              2.  *Batson/Wheeler* Motion and Trial Court's Ruling[3]

9         The prosecutor exercised a peremptory challenge against Ms. S., and the defense made a

10    Batson/Wheeler motion.[4]  Defense counsel stated, "Ms. S[.] is African American and, for the

11    record, my client is African American.  It did not seem to me that there was a race-neutral reason

12    for challenging Ms. S[.]"  ART 414 (ECF No. 11-30 at 4).  The trial court found that petitioner

13    had made out a prima facie case because Ms. S. "fit into the classification for which such a

14    motion can be made."

15         In response, the prosecutor explained that Ms. S. had been excused because she had

16    "extreme difficulty understanding the concept" of using circumstantial evidence to prove intent,

17    while "none of the other jurors had that issue.  They all readily understood the concept and agreed

18    with it.  She did not."  The prosecutor continued, "I talked about if I dropped [the microphone]

19    and I picked it up and it was cracked.  And she even had difficulty with that concept."  The

20    prosecutor also cited Ms. S.'s statement that she could not know what was in someone's mind as

21    problematic regarding her understanding of circumstantial evidence.  She argued that "the People

22    are concerned specifically because of her inability to comprehend and be willing to apply

23    circumstantial evidence to determine a person's intent because that's going to be extremely

24    important in this case," where "the charges are premeditated, willful, and deliberate.  There's also

25    _____

26    [3]  The motion hearing is transcribed at ART 414-420 (ECF No. 11-30 at 4-10).
      [4]  Batson v. Kentucky, 476 U.S. 79 (1986); People v. Wheeler, 22 Cal.3d. 258 (1978).  Wheeler is
27    the California procedural equivalent of Batson, which prohibits the use of racially motivated
      peremptory challenges as a matter of federal law.  Crittenden v. Ayers, 624 F.3d 943, 951 n.2 (9th
28    Cir. 2010).  "[A] Wheeler motion serves as an implicit Batson objection."  Id.

1    a kill zone theory . . . ."[5]  Finally, the prosecutor expressed concern that Ms. S.'s statement, "'I

2    don't know what you want me to say,'" or, "'I don't know what you want me to tell you,'"

3    suggested that she is going to "say anything to, in essence, to appease me or to address whatever

4    my concern is."  Defense counsel responded that Ms. S. answered the questions intelligently and

5    showed she understood the concept of circumstantial evidence.[6]

6            The trial court denied the motion.  It first acknowledged Ms. S. was not the only person

7    who questioned whether one could know what another person is thinking, observing that another

8    juror made a similar comment but was excused for hardship.  However, the trial court referenced

9    the prosecutor's microphone hypothetical, noting that the prosecutor asked Ms. S. to draw an

10   inference where she "threw [the microphone] down" behind the partition while acting it out.  The

11   trial court concluded, "[T]hat example about [the microphone]—without the instruction of telling

12   them how to weigh circumstantial evidence as opposed to direct evidence is murky.  But that

13   example of throwing down with force—and [the prosecutor] acted it out—and then [Ms. S.'s]

14   answers in response to that, and also that answer, 'well, what do you want me to say,' I do find

15   that that is a race-neutral basis for the exclusion and I am going to deny the <u>Wheeler</u> motion."

16            B.  The Clearly Established Federal Law

17           Purposeful discrimination on the basis of race in the exercise of peremptory challenges

18   violates the Equal Protection Clause of the United States Constitution.  <u>See</u> <u>Batson v. Kentucky</u>,

19   476 U.S. 79 (1986); <u>Johnson v. California</u>, 545 U.S. 162 (2005).  <u>Batson</u> claims are evaluated

20   under a three-step test:

21           First, the defendant must make out a prima facie case "by showing
         that the totality of the relevant facts gives rise to an inference of
22       discriminatory purpose."  [Citations].  Second, once the defendant
         has made out a prima facie case, the "burden shifts to the State to
23       explain adequately the racial exclusion" by offering permissible

24   _____

25   [5]  Under California law, the intent element of attempted murder may be satisfied by evidence that
     a defendant deliberately chose a method of killing that created a zone of fatal danger.  A jury may
26   infer from such evidence that the defendant intended to kill persons in that zone.  <u>See</u> <u>People v.</u>
     <u>Bland</u>, 28 Cal.4th 329-331 (2002); CALCRIM 600.
27   [6]  Defense counsel did not argue in the trial court that comparison of Ms. S. and Juror No. 10
     supported a conclusion that Ms. S.'s race was the actual (or a substantial motivating) reason for
28   the strike.  That issue was first raised in the California Court of Appeal.

                                                       9

1    race-neutral justifications for the strikes.  [Citations.]  Third, "[i]f a
2    race-neutral explanation is tendered, the trial court must then decide
     . . . whether the opponent of the strike has proved purposeful racial
     discrimination." [Citation.]

3

4    Johnson, 545 U.S. at 168 (footnote omitted).

5        At the third step of Batson, "the trial court determines whether the opponent of the strike

6    has carried his burden of proving purposeful discrimination."  Purkett v. Elem, 514 U.S. at 765,

7    768 (1995).  Although the burden remains with the defendant to show purposeful discrimination,

8    the third step of Batson primarily involves a credibility determination made by the trier of fact.

9    After the prosecution puts forward a race-neutral reason, the court is required to evaluate "the

10   persuasiveness of the justification."  Id.  To accept a prosecutor's stated nonracial reasons, the

11   court need not agree with them.  The question is not whether the stated reason represents a sound

12   strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge

13   should be believed."  Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion).  This

14   credibility determination must be made in light of the totality of the relevant facts about a

15   prosecutor's conduct.  Batson, 476 U.S. at 94; see also Hernandez, 500 U.S. at 363.  Courts must

16   perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be

17   available."  Murray v. Schriro, 745 F.3d 984, 1004 (2014) (quoting Batson, 476 U.S. at 93).

18   Evidence of intent may include comparison of the jurors who were stricken with those who were

19   allowed to remain.  See, e.g. Miller-El v. Dretke, 545 U.S. 231, 241 (2005).  Disparate treatment

20   of similarly situated jurors may demonstrate that a prosecutor's facially race-neutral reasons are a

21   pretext for discrimination.  Id. ("If a prosecutor's proffered reason for striking a black panelist

22   applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence

23   tending to prove purposeful discrimination to be considered at Batson's third step" (citation

24   omitted)); see also Snyder v. Louisiana, 552 U.S. 472, 482-83 (2008).

25       On appeal, a trial court's ruling on the ultimate issue of discriminatory intent must be

26   sustained unless it is clearly erroneous.  Hernandez, 500 U.S. at 365.  Because the trial court is in

27   a unique position to observe the demeanor of both the prosecutor and the juror, which weigh

28   heavily in the credibility determination, its ruling is entitled to deference absent exceptional

10

1    circumstances.  Snyder, 552 U.S. at 477.

2              C.  The State Court's Ruling

3        This claim was exhausted on direct appeal.  Because the California Supreme Court denied

4    discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

5    decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

6    501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

7        Following recitation of the governing law, the appellate court ruled in pertinent part as

8    follows:

9              1. Substantial evidence review

10             Substantial evidence supports the trial court's conclusion that the
       prosecutor provided sufficient, race-neutral justifications for
11     exercising its preemptory challenge against Ms. S.  During voir dire,
       the prosecutor addressed whether the prospective jurors could use
12     circumstantial evidence to infer intent, as it was at the crux of the
       case.  Ms. S. resisted the concept despite multiple attempts by the
13     prosecutor to illustrate the concept.  She first asserted that a wet
       raincoat "doesn't mean it rained," while failing to consider the other
14     elements in the hypothetical, including umbrellas, a wet street, and
       puddles.  She further insisted in response to another hypothetical that
15     the presence of snow on the ground at a cabin at which there
       previously was no snow did not "tell [her] anything."  And while Ms.
16     S. initially agreed that a car in the right turn lane with brake lights
       and a right turn signal indicated that the car would turn right, she then
17     backtracked, saying "that person might decide to go left, although he
       gets the signal that he's going right.  [¶] . . . So there's always a
18     possibility of something else happening."  Moreover, Ms. S. asserted
       she was not suspicious of circumstantial evidence, but that she was
19     suspicious of the examples the prosecutor had given.  Finally, when
       the prosecutor asked Ms. S. what she could infer from the prosecutor
20     slamming her microphone to the ground and the microphone
       breaking, Ms. S. said she "need[ed] more" information before she
21     could reach a conclusion.  And although Ms. S. confirmed that she
       could give circumstantial evidence the same weight as direct
22     evidence, she then suggested she could not use circumstantial
       evidence to determine a person's intent, asking, "How would you
23     know what someone is thinking? I don't have those skills."  Thus,
       the record supports the prosecutor's contention, and the trial court's
24     finding, that Ms. S. was properly excluded for struggling to
       understand, or otherwise resisting, the concept of circumstantial
25     evidence.  [Footnote omitted.]

26             Additionally, the prosecutor's related concern that Ms. S. might say
       anything to appease her was supported by substantial evidence.  After
27     some resistance, Ms. S. accepted the microphone hypothetical.
       However, when the prosecutor told Ms. S. she felt like she was
28     "guessing" when she agreed there was no difference between direct

                                       11

and circumstantial evidence in that context, Ms. S. responded, "I don't know what you want me to say." The prosecutor assured Ms. S. that she wanted Ms. S. to "tell me what you think," yet Ms. S. still expressed doubt that she should respond with candor, asking, "You really want me [to] tell you what . . . I think?" When the prosecutor confirmed again that she really wanted Ms. S. to tell her what she thought, Ms. S. retracted her agreement with the microphone hypothetical, saying, "I can't judge on just one thing just because you dropped it and say, 'Oh, that person's thinking about this.' Whatever. I just need more."

One could reasonably infer from these answers, as the prosecutor and trial court did here, that Ms. S. might have shaded her responses in an effort to satisfy the prosecutor rather than respond with full transparency. Specifically, although Ms. S. eventually agreed with the prosecutor that direct and circumstantial evidence had equal value in the microphone hypothetical, when assured she should tell the truth, Ms. S. seemingly withdrew her agreement. Based on the foregoing, the trial court did not err in crediting the prosecutor's rationale as legitimate, race-neutral bases for exclusion. [Footnote omitted.]

2. Comparative juror analysis

Defendant argues that the prosecutor's explanations were not genuine because Juror No. 10 gave similar responses to Ms. S. regarding circumstantial evidence. As defendant insists that Juror No. 10 and Ms. S. were virtually indistinguishable, but for their race, he argues that the prosecutor's rationale was therefore not credible and her decision to exclude Ms. S. was racially motivated.

"When a court undertakes comparative juror analysis, it engages in a comparison between, on the one hand, a challenged panelist, and on the other hand, similarly situated but unchallenged panelists who are not members of the challenged panelist's protected group. [Citation.]" (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1173.) "[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination. . . . Thus, evidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons." (*Lenix*, supra, 44 Cal.4th at p. 622.) However, "comparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard. . . . Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent." (*Id.* at p. 624.)

Further, "comparative juror analysis on a cold appellate record has inherent limitations." (*Lenix, supra*, 44 Cal.4th at p. 622, citing *Snyder v. Louisiana, supra*, 552 U.S. at p. 483.) "'[T]he manner of

12

the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record.' [Citation.]" (*Lenix*, at p. 622.) Thus, "[t]wo panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (*Id.* at p. 624.)

Defendant asserts for the first time on appeal that Juror No. 10's responses to the circumstantial evidence queries were effectively the same as Ms. S.'s responses, raising doubts regarding the prosecutor's race-neutral rationale for exclusion. At the outset, we reiterate that a comparative juror analysis may only be probative where the unchallenged panelist is not a member of the same protected group as the challenged panelist. (*People v. Gutierrez*, supra, 2 Cal.5th at p. 1173.) While defendant represents that Juror No. 10 was not African-American, and the Attorney General does not challenge this characterization, defendant fails to support this assertion with a record citation. "It is the duty of counsel to refer us to the portion of the record supporting [defendant's] contentions on appeal. [Citations.]" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738; *People v. Hyatt* (1971) 18 Cal.App.3d 618, 624 [where brief fails to specify portions of record supporting factual assertions, record is presumed to support trial court's rulings].) As defendant failed to establish with record citations that Juror No. 10 is not in the same protected category as Ms. S., a key threshold question, we cannot fully assess the merit of any comparative juror analysis.

However, even assuming Juror No. 10 was not African-American, the record reveals that they were distinct from each other in multiple ways, diminishing the persuasive effect of any comparative analysis. Ms. S. was a retired accountant, widow, and a mother, grandmother, and great-grandmother who had previously served on a jury. Juror No. 10 was single, employed as a process engineer, had no children, her stepfather was a retired officer from the Stockton Police Department, and she had never served as a juror. Thus, their "training, employment, prior jury service, and experience" were dissimilar. (*People v. Johnson* (1989) 47 Cal.3d 1194, 1220, overruled on other grounds in *People v. Gutierrez*, supra, 2 Cal.5th at p. 1174.) Moreover, their responses to questions regarding their personalities and abilities to deliberate within a group differed. Ms. S. admitted she could have "control issues" when "put in a corner or something like that," while Juror No. 10 stated she was "independent," and confirmed she would neither "push nor be pushed." And unlike Ms. S., Juror No. 10 did not ask the prosecutor what she wanted her to say, or otherwise question whether she should reveal her true thoughts, during voir dire.

Accordingly, the two candidates differed in numerous respects, rendering any comparative analysis of limited use. (*See People v. Winbush* (2017) 2 Cal.5th 402, 443 [pretext is established "when the compared jurors have expressed 'a substantially similar combination

13

of responses,' in all material respects"], original italics.)  This is particularly true here, where there is a single discriminatory challenge, the record reveals a ""sound, objectively plausible basis"" for the challenge, [footnote omitted] and we must credit ""the legitimate role that subjective factors may have in a prosecutor's decision' to challenge or not challenge jurors peremptorily." (*People v. Williams* (2006) 40 Cal.4th 287, 313.)  Thus, a comparison of the two jurors is insufficient to support defendant's claim that the trial court erred in denying his *Batson/Wheeler* motion.

ECF No. 11-38 at 11-16.

    D.  Objective Reasonableness Under § 2254(d)

       1.  Overview

In considering whether a state court's decision is "contrary to" or "an unreasonable application of" Batson under § 2254(d)(1), the U.S. Supreme Court has recognized that Batson clearly establishes the requirement that courts perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  Murray v. Schriro, 745 F.3d 984, 1004 (2014) (quoting Batson, 476 U.S. at 93).  State courts disobey this clearly established requirement if they ""rubberstamp' a prosecutor's proffered race-neutral explanation for exercising a disputed peremptory strike," or "misstate[ ] the test," or "impermissibly rel[y] on an erroneous factor."  Id. at 1005.

Here, the California Court of Appeal did not misstate the test required under Batson and progeny.  Neither did the state court merely "rubberstamp" the prosecutor's proffered race-neutral explanation for striking Ms. S. or rely on any impermissible factor.  The court laid out a reasoned analysis that responded to petitioner's arguments, addressed the pertinent portions of the voir dire record, and considered the factors that are relevant to the ultimate question of prosecutorial motive.  Although petitioner has ably argued the case for inferring a discriminatory motive, he has not identified anything objectively unreasonable about the state court's reasoning or its conclusion.

For the reasons explained below, the undersigned finds that the state court relied on no objectively unreasonable factual findings or objectively unreasonable application of U.S. Supreme Court precedent in concluding that the trial court's credibility determination at step three of Batson should not be disturbed.

14

1            2.   The State Court Did Not Base Its Decision on Unreasonable Determinations of

2               Fact

3        Petitioner contends that the California Court of Appeal made eight specific errors of fact

4 that support habeas relief under § 2254(d)(2), which provides that federal relief is not barred

5 where a state court's decision is "based on" an unreasonable determination of fact. Several of

6 these allegations of error focus on the appellate court's characterizations of Ms. S.'s voir dire

7 statements, and some focus on the opinion's choice of words. The undersigned is unpersuaded.

8        First, petitioner argues that the state court unreasonably determined that the statements

9 about circumstantial evidence made by Ms. S. and Juror No. 10 were substantially dissimilar.

10 ECF No. 1 at 26-28. Petitioner identifies discrete comments made by both jurors which,

11 extracted from their contexts, are indeed similar. But the ultimate question for the court of appeal

12 was whether the trial court had erred in finding that all relevant circumstances, taken together,

13 indicated that the prosecutor's asserted reason for striking Ms. S. was the true reason. While both

14 Ms. S. and Juror No. 10 made some similar statements, Ms. S. also made statements which even

15 on a cold record appear to equivocate about her willingness to rely on circumstantial evidence and

16 to draw inferences about intent from such evidence. For example, in response to the hypothetical

17 about seeing snow on the ground in the morning, Ms. S. responded "It doesn't tell me anything"

18 about whether it had snowed overnight. Juror No. 10 made no such statement.

19        Moreover, the transcript of voir dire—on which the California Court of Appeal, like this

20 court, had to rely—fails to convey the tone of voice, facial expressions, and body language which

21 accompanied those statements. It is easy to imagine phrases such as "Just because [a raincoat]

22 has water on it doesn't mean it rained," "How would you know what someone is thinking?" and

23 "I don't know what you want me to say" conveying very different attitudes depending on

24 delivery. The significance of tone and demeanor in this context is the reason that the Supreme

25 Court requires deference to trial judges as a general rule. See Snyder, 552 U.S. at 477. In this

26 case the prosecutor stated that she thought Ms. S. remained suspicious of circumstantial evidence

27 even after affirming that she would consider it, which suggests that Ms. S. was communicating

28 skepticism in ways other than the words on which petitioner relies. That neither the defense nor

1  the prosecution made any record of non-verbal cues which may (or may not) have distinguished

2  Ms. S. from Juror No. 10 is a consequence of the fact that the defense did not rely on comparative

3  juror analysis in the trial court.  In any event, the similarities between the statements made by Ms.

4  S. and Juror No. 10 do not so outweigh the differences identified by the state court as to make the

5  finding objectively unreasonable.

6        Second, petitioner alleges that the state court unreasonably determined that Ms. S.

7  indicated she "could not" use circumstantial evidence to determine a person's intent.  ECF No. 1

8  at 28-29.  Petitioner points to Ms. S.'s further statement that in determining intent she would

9  consider "all the evidence," urging this court to conclude that Ms. S. had clearly expressed

10  willingness to consider circumstantial evidence.  The ultimate question here is whether it was

11  unreasonable for the state appellate court, on the record before it, to defer to the trial court's

12  finding that the prosecutor had indeed excused Ms. S. because of concerns about her attitude

13  toward circumstantial evidence.  The fact that Ms. S. made numerous inconsistent statements on

14  that point is sufficient to support the state court's conclusion.  That Ms. S. may have been

15  theoretically capable of reasoning inferentially is immaterial, and the California Court of Appeal

16  did not base its decision on a finding that she was categorically incapable of doing so.

17        Third, petitioner contends that "[t]he State court unreasonably determined that Ms. S.

18  withdrew her agreement that direct and circumstantial evidence had equal value."  ECF No. 1 at

19  30.  The state court's decision was not based on a finding that there had been a "withdrawal" of

20  agreement, and petitioner places entirely too much significance on this choice of words.  Ms. S.'s

21  statements can reasonably be interpreted as backtracking or equivocating on the matter.  The trial

22  court had found in essence that Ms. S.'s overall skepticism about circumstantial evidence

23  provided a permissible basis for the strike, and the court of appeal held that the record as a whole

24  supported this finding.  There was no objectively unreasonable finding of fact.

25        Fourth, petitioner argues that it was unreasonable of the state appellate court "to omit the

26  fact from its analysis" that the trial court never mentioned Juror No. 10.  ECF No. 1 at 30-31.

27  The trial court did not mention Juror No. 10 because defense counsel did not raise the issue of

28  Juror No. 10 at the <u>Batson/Wheeler</u> hearing.  The California Court of Appeal did in fact note that

1    comparative analysis involving Juror No. 10 was argued for the first time on appeal.  Petitioner

2    identifies no clearly established federal law requires a trial court to independently identify

3    theories in support of a <u>Batson</u> motion beyond those presented by the parties.  To the contrary, it

4    is a clearly established rule that the defendant bears the burden of persuasion.  <u>See</u> <u>Purkett</u>, 514

5    U.S. at 768.  Accordingly, this purported factual error has no significance under § 2254(d)(2).

6           Fifth, petitioner alleges that the state court erred in finding that Ms. S. "struggle[ed] to

7    understand" the concept of circumstantial evidence.  ECF No. 1 at 31.  Petitioner suggests that the

8    state court was impugning Ms. S.'s intellectual capabilities.  But the appellate court was merely

9    pointing out that Ms. S.'s shifting and often skeptical statements regarding circumstantial

10    evidence lent credence to the prosecutor's explanation of the basis for the strike.  Accordingly,

11    the appellate court's holding was not based on any factual error regarding Ms. S.'s actual

12    understanding of circumstantial evidence.

13           Petitioner's sixth and seventh points—that the California Court of Appeal failed to

14    consider the fact that the prosecutor spent far more time questioning Ms. S. than she did

15    questioning Juror No. 10, and that the state court's comparative juror analysis cited irrelevant

16    factors and omitted "obvious factors that were contrary to its opinion," ECF No. 1 at 32-33—

17    will be addressed below regarding the state court's application of clearly established law in its

18    comparative juror analysis.

19           Eighth and finally, petitioner contends that it was objectively unreasonable for the state

20    court to hold that "[t]he prosecutor's related concern that Ms. S. might say anything to appease

21    her was supported by substantial evidence."  ECF No. 1 at 33-35.  The reference to appeasement

22    relates to the exchange in which Ms. S. said, among other things, "What do you want me to say?"

23    It is impossible to tell from the cold transcript whether Ms. S. was speaking in a way that

24    conveyed hostility, ingratiation, or a simple desire for the prosecutor to drop the issue.  In any

25    event, the outcome of the <u>Batson</u> claim did not turn on the accuracy of the word "appease."  What

26    matters is that Ms. S.'s statements, taken as a whole, were not inconsistent with the prosecutor's

27    asserted basis for the strike.  Accordingly, there was no objectively unreasonable finding of fact.

28    ////

1            3.    The Standard of Review Applied on Appeal Does Not Provide a Basis for

2                 Federal Habeas Relief

3        Petitioner argues that the California Court of Appeal should have reviewed the

4 Batson/Wheeler issue de novo (rather than conducting substantial evidence review) because the

5 trial court's ruling had been based on factual errors and omissions. ECF No. 1 at 35-37. This

6 argument is predicated on the theory that the trial court (1) mischaracterized Ms. S.'s statements,

7 and (2) failed to conduct comparative juror analysis sua sponte. Id. Both contentions are rejected

8 for the reasons explained above. The California Court of Appeal's approach was not inconsistent

9 with the clearly established requirements that the trial court's ruling on discriminatory intent be

10 affirmed unless clearly erroneous, Hernandez, 500 U.S. at 365, and is entitled to deference absent

11 exceptional circumstances, Snyder, 552 U.S. at 477. Moreover, in this case the standard of

12 appellate review does not implicate the application of clearly established federal law in any way

13 that is independent of the merits of the issue. Accordingly, to the extent petitioner relies on the

14 U.S. Supreme Court's comparative juror analysis jurisprudence, his arguments are considered

15 below.

16            4.    The State Court Did Not Unreasonably Apply Clearly Established Principles of

17                 Comparative Juror Analysis

18        Petitioner first presents this court with his argument that a comparative juror analysis of

19 Ms. S. and Juror No. 10 establishes racial discrimination, ECF No. 1 at 38-47, as if de novo

20 review of the Batson issue was available here. Petitioner's disagreement with the California

21 Court of Appeal, however, does not make its decision objectively unreasonable within the

22 meaning of § 2254(d).

23        To the extent petitioner argues that the Batson analysis was unreasonable in that it relied

24 on various alleged factual errors, most of those have been addressed above. In addition to the

25 points previously discussed, petitioner emphasizes that the prosecutor spent far more time

26 questioning Ms. S. than she did questioning Juror No. 10, a fact which was not considered by the

27 appellate court. ECF No. 1 at 32, 43-44. Disparate questioning of jurors who are similar but for

28 race can indeed support an inference of racial discrimination. Miller-El, 537 U.S. at 344.

1    Accordingly, it is a factor that may be relevant.  Here, however, the time spent questioning Ms. S.

2    about circumstantial evidence and determination of intent was directly related to her own

3    skeptical comments about those matters.  The transcript reflects reasonable follow-up, not racial

4    targeting.  Whether characterized as an issue of fact or of law, the state court's failure to address

5    this issue does not render its decision objectively unreasonable.

6        Petitioner also argues that it was either an unreasonable application of federal law or an

7    unreasonable factual determination for the state court to "opine[] that the trial court might have

8    credited the prosecution for preferring Juror #10 to Ms. S. for a variety of biographical or

9    personality reasons."  ECF No. 1 at 32.  The cited portion of the appellate opinion merely noted

10   that Ms. S. and Juror No. 10 differed in demographic ways that undercut the probative value of

11   comparing them.  It is clearly established in the Batson context that racial motivation may be

12   demonstrated where substantially similar jurors of different races are treated differently, and

13   inversely that differences other than race can undercut the comparison.  See, e.g., Murray v.

14   Schriro, 745 F.3d 984, 1008 (9th Cir. 2014).[7]  There is nothing objectively unreasonable about

15   this observation.  The appellate opinion cannot be fairly read as affirming the trial court on

16   grounds that biographical or personality considerations supported the strike.  Petitioner here

17   attacks a straw man of his own devising.

18       Petitioner contends further that "it is possible that the prosecution's argument that this

19   professional woman was not intelligent enough to 'understand[] the concept of using . . .

20   circumstantial evidence to prove intent' was based on subconscious stereotypes about African-

21   Americans that are still commonplace."  ECF No. 1 at 46.  The undersigned does not doubt the

22   persistence and pernicious effects of unconscious racism, but here it is a red herring.  The

23

24   _____

     [7]  Of course, there is no rule that comparisons are probative only if the situations of the jurors
25   compared are identical in all respects.  Miller-El, 545 U.S. at 247 n.6.  "A per se rule that a
     defendant cannot win a Batson claim unless there is an exactly identical white juror would leave
26   Batson inoperable; potential jurors are not products of a set of cookie cutters."  Id.  But here the
     state court did not reject the Batson claim for lack of a non-Black juror identical to Ms. S.
27   Rather, it found that Juror No. 10 was not sufficiently similar to Ms. S. that the comparison
     supported an inference of racial discrimination.  While reasonable minds may differ on that
28   question, the state court's analysis was not objectively unreasonable.

                                            19

1    prosecutor did not remotely suggest that Ms. S. lacked the intelligence to comprehend principles

2    of evidence.  Rather, she doubted whether Ms. S. would in this case be sufficiently receptive to a

3    case-in-chief that depended entirely on circumstantial evidence to establish essential elements of

4    the charges.  That is a perfectly legitimate basis for a strike, especially in this case where intent

5    was central to the five attempted murder charges.  See Batson, 476 U.S. at 98 (reasons cited for

6    strike must be "related to the particular case to be tried.").  Petitioner bears the burden of

7    demonstrating that the strike was motivated in substantial part by race.  Cook v. LaMarque, 593

8    F.3d 810, 815 (9th Cir. 2010).  The mere "possibility" that implicit bias played a role is

9    insufficient as a matter of law.

10          Finally, petitioner argues that the state appellate court unreasonably applied Batson

11    jurisprudence by focusing on points never raised by the prosecutor.  ECF No. 1 at 47-49.

12    Petitioner quotes the Supreme Court's statement in Miller-El that "if the [prosecution's] stated

13    reason does not hold up, its pretextual significance does not fade because a trial judge, or an

14    appeals court, can imagine a reason that might not have been shown up as false."  Id. at 48

15    (quoting Miller-El, 545 U.S. at 252).  The quoted language means that a strike motivated in

16    significant part by race cannot be immunized by a reviewing court's determination that there were

17    other reasons, not actually relied on by the prosecutor, that could have supported a strike of the

18    juror.  But there has been no showing here that the strike was motivated in significant part by

19    race.  The state court did not affirm denial of the Batson motion because it identified legitimate

20    reasons *other than* skepticism regarding circumstantial evidence which could have supported a

21    strike of Ms. S.  Its reference to factors not argued by the prosecutor as a basis for the strike—

22    different family and job situations—was made in the distinct context of explaining why

23    comparison of Ms. S. and Juror No. 10 did not support an inference of racial discrimination.  The

24    court did not suggest that Ms. S.'s family circumstances or career history provided legitimate

25    reasons to strike her, which is what Miller-El forbids.  Even if the state court erred by mentioning

26    irrelevant distinctions between Ms. S. and Juror No. 10, that was not the basis for its ruling and

27    § 2254(d) is therefore not implicated.

28          In sum, the state court rejected petitioner's comparative juror theory on grounds that Ms.

20

1    S. expressed a unique degree of skepticism about circumstantial evidence and the inference of

2    intent from such evidence.  For all the reasons explained above, that conclusion did not rest on

3    any objectively unreasonable factual findings or objectively unreasonable application of Supreme

4    Court precedent.  Relief is therefore unavailable on this claim.

5         II.    Claim Two: Failure to Instruct Jury on Self-Defense

6              A.  Petitioner's Allegations and Pertinent State Court Record

7              Petitioner alleges that his right to present a defense was violated by the trial court's refusal

8    to instruct the jury on self-defense.  At trial, petitioner sought a self-defense instruction based on

9    Asad's testimony that gunfire might have come from both cars.  After the trial court reviewed

10   Asad's testimony, it found that there was no evidence that defendant had a "genuine and honest

11   belief that he was in imminent danger of death or great bodily injury from an unlawful attack"

12   such that his conduct was necessary to prevent such an injury.  It accordingly denied petitioner's

13   request for the instruction.  RT 1365 (ECF No. 11-19 at 83).

14             B.  The Clearly Established Federal Law

15             The Constitution guarantees to criminal defendants the right to present a defense.

16   Chambers v. Mississippi, 410 U.S. 284 (1973); Crane v. Kentucky, 476 U.S. 683, 690 (1986); .

17   "A defendant's right to present relevant evidence is not unlimited, but rather is subject to

18   reasonable restrictions," such as evidentiary and procedural rules.  United States v. Scheffer, 523

19   U.S. 303 (1998); see also Chambers, 410 U.S. at 302 (in exercising the right to present a defense,

20   accused must "comply with established rules of procedure and evidence designed to assure both

21   fairness and reliability in the ascertainment of guilt and innocence.").  State rules limiting the

22   admissibility of defense evidence are constitutionally permissible as long as they are rationally

23   related to the legitimate purpose of excluding evidence that has only a weak logical connection to

24   the central issues at trial.  Holmes v. South Carolina, 547 U.S. 319, 326-330 (2006) (regarding

25   third-party culpability evidence).

26             Errors in instructing the jury implicate a defendant's constitutional rights only if they "so

27   infect[] the entire trial that the resulting conviction violates due process."  Estelle v. McGuire,

28   502 U.S. 62, 71 (1991).  It is not enough that instructions are "undesirable, erroneous, or even

                                          21

1    'universally condemned.'" Cupp v. Naughten, 414 U.S. 141, 147 (1973).  Alleged instructional

2    error "must be considered in the context of the instructions as a whole and the trial record."

3    Estelle, 502 U.S. at 72.  In challenging the failure to give an instruction, a habeas petitioner faces

4    an "especially heavy" burden because "[a]n omission, or an incomplete instruction, is less likely

5    to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

6            C.   The State Court's Ruling

7        The California Court of Appeal first set forth the state law principles that governed the

8    trial court's ruling:

9            Upon a defendant's request, the trial court must issue a jury
            instruction where there is substantial evidence to support the
10           instruction.  (People v. Stevenson (1978) 79 Cal.App.3d 976, 985;
            see People v. Elize (1999) 71 Cal.App.4th 605, 615.)  In this context,
11           to determine whether the evidence is sufficient to warrant a jury
            instruction, the court does not assess credibility, but only whether the
12           evidence, if believed by a jury, would be sufficient to raise a
            reasonable doubt.  (People v. Mentch (2008) 45 Cal.4th 274, 288.)
13           The court resolves any doubts regarding the sufficiency of the
            evidence to warrant an instruction in defendant's favor.  (People v.
14           Eid (2010) 187 Cal.App.4th 859, 879.)  However, "[t]he trial court
            need not give instructions based solely on conjecture and
15           speculation."  (People v. Young (2005) 34 Cal.4th 1149, 1200.)

16           "To justify an act of self-defense . . . . , the defendant must have an
            honest and reasonable belief that bodily injury is about to be inflicted
17           on him. [Citation.]' [Citation.] The threat of bodily injury must be
            imminent [citation], and '. . . any right of self-defense is limited to
18           the use of such force as is reasonable under the circumstances.
            [Citation.]' [Citations.]"  (People v. Minifie (1996) 13 Cal.4th 1055,
19           1064-1065, original italics; CALCRIM No. 3470.)

20   ECF No. 11-38 at 17-18.

21       The appellate court went on to analyze the issue as follows:

22           In this case, substantial evidence did not support an instruction on
            self-defense.  Defendant's proposed self-defense theory was that
23           Rayleen or Harvey shot at defendant, causing defendant to shoot at
            their car in self-defense.  Crucially, however, there is no evidence
24           that any of the occupants of Harvey's car had a firearm at the time of
            the incident.  Rayleen testified that no one in the car had a firearm
25           and that no one in their car shot at defendant.  The police did not
            recover any firearms from the vehicle nor book any firearms into
26           evidence.  Moreover, a search of defendant's vehicle revealed no
            bullet holes, blood, or any other circumstantial evidence that might
27           indicate someone had fired a gun from the vehicle at defendant.  And,
            contrary to defendant's contention, the fact that only three to four
28           bullets were accounted for, while Rayleen and Asad testified there

22

may have been five or six gunshots, does not constitute evidence that unaccounted for gunshots, if any, came from both cars.

Next, although defendant argues that Asad's testimony provided a basis for the instruction, Asad admitted that his statements indicating gunshots came from both cars were pure speculation.  In Asad's 911 call, the dispatcher asked whether there was "more than one car shooting," to which Asad responded, "Yes, um I'm not too sure it just sounded like gun shots right in front of me.  And it was right in the middle of the street."  When the dispatcher asked if both cars were struck by the bullets, Asad said, "I believe so, um that's because I saw glass on the floor.  When I passed by."  However, Asad testified that he did not see any windows break and did not know where the glass came from or if it was in the street before the shooting.  Asad also testified that he did not see a gun and did not know which car the gunshots came from.  Further, although he testified that the gunshots "sounded like return fire," he then clarified that he did not know how many cars were shooting, and that was "assuming" and "speculating" that gunshots came from both cars.  As a result of Asad's statements, the trial court granted the prosecutor's motion to strike all references to "return fire" from Asad's testimony on the grounds that it was speculation.  On redirect examination, Asad agreed he was speculating about gunshots from both cars and said, "I speculated when I called [911,] too."  He explained he "was in a panic" when he called 911, but that he has heard two different guns firing before, and the gunshots he heard on that day "all sounded the same."  Finally, the police officer who initially spoke to Asad testified that Asad did not tell him that he heard or saw more than one gun.  Thus, Asad's testimony did not constitute substantial evidence of gunshots from Harvey's car, and therefore did not supply sufficient evidence to support a self-defense instruction.

Additionally, there was no substantial evidence that defendant had an honest and reasonable belief of imminent bodily injury. Defendant did not testify, and thus did not attest to his state of mind.  The fact that defendant was dating the mother of Harvey's child did not provide a basis for imminent fear of bodily injury, nor did Harvey's statement to Rayleen in the car, which defendant did not hear, "'Look at that bitch ass [N-word].'"  [fn: Defendant also relies on testimony regarding a confrontation between defendant and Harvey, taken from an evidentiary hearing, to argue that Harvey had motive to shoot at defendant.  As the evidentiary hearing was held outside the jury's presence, the witness's testimony at the hearing cannot provide evidentiary support for a self-defense instruction.  Moreover, defendant's confrontation with Harvey three months prior, in which defendant pointed a gun at Harvey, does not provide evidence that defendant was in reasonable, imminent fear of harm while alone in his own car, weeks later, at the time of the shooting.  Especially when defendant was the one who pursued Harvey's vehicle.]  And, even if the jury had been permitted to consider Asad's speculative testimony about return fire, Asad did not testify as to who he believed fired first.  Without substantial evidence that defendant reasonably believed he was in imminent fear of bodily injury prior to shooting, the trial court did not err in declining to issue the self-defense instruction.

23

1

2          As substantial evidence did not support a self-defense instruction, the
           trial court did not violate defendant's due process right to present a
           complete defense when it refused to give the instruction. (*People v.*
3          *Eid, supra*, 187 Cal.App.4th at p. 879 [a criminal defendant is
           entitled to instructions on a defense theory only if the theory is
           supported by the law and evidence].)
4

5          [fn: Defendant also argues that the trial court's refusal to give the
           self-defense instruction was "aggravated" by the trial court's
6          statement to the jury during closing arguments that there was no
           evidence of gunfire coming from the car. The trial court made no
7          such statement. Rather, it sustained two of the People's objections
           on the grounds that defense counsel misstated the evidence when he
8          said "it was [Asad's] impression . . . that there was more than one
           [gun] going off. That the cars were shooting at each other," and "[i]t
9          was clear to [Asad] or he believed that there were shots that were
           coming from two cars." Defense counsel accordingly told jurors that
           they could read the 911 transcript for themselves.]
10

11   ECF No. 11-38 at 18-20.

12          D.   Objective Reasonableness Under § 2254(d)

13               1.   Failure to Instruct

14          Petitioner contends that relief is available under AEDPA standards because the state

15   courts relied on the unreasonable factual finding that there was insufficient evidence to support

16   the self-defense instruction. ECF No. 1 at 56. Petitioner relies on Cage v. Louisiana, 498 U.S. 39

17   (1990) (per curiam) and Neder v. United States, 527 U.S. 1, 12 (1999), for the general proposition

18   that a criminal defendant has a right to have the jury correctly instructed as to his theory of

19   defense. Neither case is on point.[8] Petitioner does not meaningfully address the due process

20   principles which govern the failure to give a requested defense instruction under Cupp,

21   Henderson and progeny.[9]

22          In any event, petitioner has not identified an unreasonable factual determination within the

23   meaning of § 2254(d)(2). The state court's conclusion that the substantial evidence standard was

24   ─────────────────────────
     [8]  Cage is about the reasonable doubt standard. The Court held that a jury instruction defining
25   reasonable doubt in terms of "grave" or "substantial" uncertainty, and requiring "moral
     certainty," violated due process. Cage, 498 U.S. at 41. Neder presented the question whether
26   failure to instruct on materiality as an essential element of certain fraud offenses is subject to
     harmless error review on appeal; the Supreme Court held that it is. Neder, 527 U.S. at 4. Neither
27   case addresses the circumstances under which a failure to instruct on a theory of defense, or give
     an instruction requested by the defense, violates a defendant's constitutional rights.
28   [9]  See supra, section II.B.

                                                24

1   not satisfied is not itself a factual finding, it is the application of a legal standard to a factual

2   record.  And there was no error in the state courts' underlying recitation of Asad Shah's testimony

3   or any other relevant evidence.  In his traverse, petitioner argues that the Court of Appeal

4   erroneously stated that all references in Shah's testimony to "return fire" had been stricken.  Even

5   if the Court of Appeal had misstated the scope of the trial court's ruling,[10] its ruling on the

6   instructional issue did not turn on a "finding" that all references to "return fire" had been stricken.

7   Rather, the court quite clearly relied on the state of the trial evidence as a whole—including the

8   victims' testimony, the absence of any firearm found in the victims' car, and Shah's testimony

9   walking back his reference to "return fire" and clarifying that he did not know whether there was

10  shooting from both cars.  Where the state court's decision was not "based on" the alleged factual

11  error, § 2254(d)(2) offers no avenue for relief.

12          Neither has petitioner demonstrated an unreasonable application of clearly established

13  federal law in the failure to give the instruction.  The question whether a factual predicate exists

14  for the giving of a particular instruction is a question of state law; due process is offended only if

15  an erroneous failure to instruct rendered the trial fundamentally unfair.  It was not objectively

16  unreasonable for the state court to identify no fundamental unfairness here.  As the court noted in

17  affirming the failure to instruct in self-defense, there was a complete absence of evidence that

18  petitioner had an honest and reasonable belief that his own life was in danger.  Even if there had

19  been unequivocal testimony that shots had been fired from both vehicles—which there was not—

20  the evidentiary predicate for self-defense would have been lacking.  Accordingly, the trial cannot

21  have been rendered fundamentally unfair by the failure to instruct the jury on self-defense.

---

22  [10]  This court's reading of the record accords with that of the California Court of Appeal.  After

23  Shah testified that he had "assum[ed]" gunfire was coming from both cars, and then admitted this
    was speculation on his part, the prosecutor moved to strike "all of that testimony as speculation."

24  RT 273 (ECF No. 11-12 at 95).  The court stated: "I don't know what testimony you mean when
    you say 'all.'  But to the extent that he said return fire and has just indicated it is speculation, the

25  words 'return fire' will be stricken."  Id.  The undersigned does not agree with petitioner that this

26  ruling left before the jury other instances of Shah's use of the phrase "return fire."  See ECF No.
    15 (traverse) at 28-29.  But in any event, Shah's highly equivocal testimony about his own initial

27  assumption that there had been an exchange of gunfire, and his acknowledgement that he did not
    actually witness anyone shooting from the victim's car, dooms petitioner's theory that

28  fundamental fairness was violated by the failure to give a self-defense instruction.

1        2.  Right to Present a Defense

2        Petitioner argues further that his right to present a defense was violated because the denial

3   of a self-defense instruction "forced [him] to resort to the much less tenable defense of identity."

4   ECF No. 1 at 61.  While it is undeniably true that contesting identity was an untenable strategy on

5   the facts of this case, in which the victims knew the shooter and had a clear view of him, that does

6   not entitle petitioner to instructions on a theory unsupported by evidence.

7        The clearly established federal law regarding the right to present a defense all deals with a

8   defendant's right to present evidence and testimony on his own behalf.  See Crane, 476 U.S. at

9   690 (exclusion of defense evidence); Chambers, 410 U.S. 284 (exclusion of defense evidence);

10  Webb v. Texas, 409 U.S. 95 (1972) (per curiam) (testimony of defense witnesses); Washington v.

11  Texas, 388 U.S. 14 (1967) (testimony of defense witnesses).  In Nevada v. Jackson, 569 U.S. 505

12  (2013), the Supreme Court reversed the Ninth Circuit's conclusion in a habeas case that these

13  principles had been unreasonably applied where a defendant in a rape case had been prevented

14  from introducing evidence of a prior, unsubstantiated allegation against him by the same woman.

15  If habeas relief is unavailable under § 2254(d) for the exclusion of obviously relevant evidence to

16  support a theory of defense, it cannot be available here.

17       Petitioner was not prevented from presenting affirmative evidence to support a self-

18  defense theory.  Indeed, he proffered none.  Neither has he argued that his cross-examination of

19  Shah or any other witness was impermissibly curtailed when he attempted to elicit testimony that

20  might have supported the giving of a self-defense instruction.  The court's independent review of

21  the trial transcript identifies no such limitations.[11]  In sum, petitioner was not prevented from

22  presenting a self-defense case.  Rather, he was denied a requested jury instruction *because he had*

23  *not presented such a case*.  That is an entirely different matter.

24       No clearly established federal law extends the right to present a defense to the asserted

25  right to jury instructions on an affirmative defense.  Even before enactment of the AEDPA, the

26  Supreme Court had held that federal habeas relief is unavailable on a claim that the failure to give

27
────────────────────────
28  [11]  In any event, limitations on cross-examination are subject to scrutiny under the Confrontation
    Clause and do not implicate the right to present a defense.  See Jackson, 569 U.S. at 511-512.

1   a jury instruction on an affirmative defense violates the right to present a defense.  See Gilmore v.

2   Taylor, 508 U.S. 333, 343-44 (1993) (finding such a claim barred by Teague v. Lane, 489 U.S.

3   288 (1989) (habeas relief unavailable for violation of rule not previously established by Supreme

4   Court)).  Where relief is barred by Teague, it is necessarily unavailable under § 2254(d)(1).  See

5   Williams v. Taylor, 529 U.S. 362, 380-382 (2000) (recognizing that § 2254(d) codifies and

6   extends Teague).  Petitioner has identified no Supreme Court or Ninth Circuit case finding a

7   constitutional violation on remotely similar facts, and the undersigned is aware of none.

8   Accordingly, there has been no unreasonable application of clearly established federal law and

9   relief is unavailable on this claim.

10                                                CONCLUSION

11          For all the reasons explained above, the state courts' denial of petitioner's claims was not

12   objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

13   HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

14          These findings and recommendations are submitted to the United States District Judge

15   assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days

16   after being served with these findings and recommendations, any party may file written

17   objections with the court and serve a copy on all parties.  Such a document should be captioned

18   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

19   he shall also address whether a certificate of appealability should issue and, if so, why and as to

20   which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

21   within fourteen days after service of the objections.  The parties are advised that failure to file

22   objections within the specified time may waive the right to appeal the District Court's order.

23   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

24   DATED: May 20, 2025

25

26                                                ALLISON CLAIRE
                                                  UNITED STATES MAGISTRATE JUDGE
27

28

                                                      27